**MO VETERANS' COMMISSION,
Mexico Veterans' Home,
Appellant,**

v.

**Phylliss VANDERHOOK, Respondent.**

**No. WD 69514.**

Missouri Court of Appeals,
Western District.

June 23, 2009.

Emily A. Dodge, Jackson, MO, for Appellant.

Robert V. Krueger, Jr., for Respondent.

Before Division Three: JAMES M. SMART JR., Presiding Judge, JOSEPH M. ELLIS, Judge and JAMES E. WELSH, Judge.

JOSEPH M. ELLIS, Judge.

The Missouri Veterans' Commission ("the Commission") appeals from a judgment affirming a decision of the Personnel Advisory Board ("the PAB") disapproving the dismissal of Phylliss Vanderhook from her employment at the Missouri Veterans' Home ("MVH") located in Mexico, Missouri. For the following reasons, we affirm.

Vanderhook had been employed as a nurse at various Missouri state facilities since January 1988. She was appointed as a Registered Nurse ("RN") III/Charge Nurse at the Mexico MVH in July 2000, and she was promoted to the position of RN IV/Unit Manager in September 2001. In 2005, Patrick Stevenson was appointed as the Director of Nursing Services and became Vanderhook's boss. He and Vanderhook had several disagreements concerning patient treatment and employee management. On April 24, 2006, the MVH's administrator and appointing authority, Carol Tolbert, notified Vanderhook that she was being involuntarily demoted for cause from a Unit Manager to a Charge Nurse. The stated reason for the demotion was her failure to effectively conduct an investigation related to an allegation of an employee sleeping during working hours. Vanderhook appealed her demotion to the PAB.

While the appeal of her demotion was still pending, on September 17, 2006, Vanderhook treated a resident, K.M., who had fallen from his bed and hit his head. When she arrived in his room, K.M. was lying curled on his side in the small space between the bed and the heater, with his head a few inches from the heater, his back near a nightstand, and his lower body under the bed. He had a pool of blood under his head, which was a potentially life-threatening situation, but Vanderhook couldn't determine its source. She performed an initial full-body assessment and determined that K.M. was conscious but unresponsive, that he appeared to have had a seizure, and that he did not appear to have broken any bones or suffered a neck injury. With the help of an aide, or

CNA, Vanderhook rolled K.M. from his side to his back to locate and stop the bleeding. The bleeding stopped after about a minute of applied pressure, and Vanderhook directed the CNA to get another aide. The three of them then moved K.M. from the floor to his bed. During all this time, at Vanderhook's direction, the aides were constantly talking to and touching K.M. to try to get a response and keep him from slipping into unconsciousness.

About ten minutes had passed at that point, and Vanderhook left her staff in control and went to the nursing station. She paged the attending physician and the relief house supervisor, Carol Shirley, to inform them of the situation and let them know that she believed K.M. should be taken to the hospital for further evaluation.[1] She also began to prepare paperwork to transfer K.M. to the hospital. Shirley arrived from another floor several minutes later, and the two of them went to K.M.'s room and conducted a neurological assessment. At some point before Shirley had completed the assessment, the attending physician responded to the page, and Vanderhook called an ambulance. K.M. was more alert and began responding to stimuli about twenty minutes after he fell. Emergency personnel arrived about ten minutes later and transported K.M. to the emergency room for further evaluation. In order to move K.M. from the bed to the gurney, they placed a metal "scoop" under him, which required him to be moved slightly. K.M. returned to the MVH a few days later; he had no neck injury and no "negative outcome" due to the fall.

Carol Shirley did not express any objection to Vanderhook's assessment or treatment of K.M. while it was happening. However, after K.M. had been transported to the hospital, Shirley contacted Tolbert and Stevenson and informed them that K.M. had fallen and that she believed Vanderhook had handled the incident inappropriately by moving K.M. from the floor to his bed. Tolbert directed Shirley to collect written statements from the nurses and aides who were involved, as well as a timeline from herself and Vanderhook. Stevenson investigated the incident over the next several days by reviewing the information that Shirley had collected and speaking with some of the individuals. During the investigation, Shirley told Stevenson that she would have acted differently by at least getting a second opinion from another licensed nurse or supervisor before moving K.M. Stevenson ultimately recommended that Vanderhook be dismissed, and Tolbert concurred after reviewing the information he had collected and speaking briefly with Vanderhook.

On September 26, 2006, Vanderhook received a notice of dismissal from her employment, effective October 3, 2006. The stated reason for dismissal was failure to accurately assess K.M. and implement appropriate action, in that she moved K.M. to the bed without notifying the house supervisor or soliciting assistance from other licensed personnel. The notice stated that moving K.M. from the floor to the bed could have exacerbated his injuries and that failure to notify the house supervisor in a timely manner resulted in the delay of appropriate critical care and necessary treatment.[2] Vanderhook appealed her dismissal to the PAB.

1. There were some discrepancies between Vanderhook's and Shirley's documentation of the timing of when she contacted Shirley, the ambulance, and the attending physician. The PAB found Vanderhook's documentation to be more credible, and we defer to the PAB's credibility determinations. *Roorda v. City of Arnold,* 142 S.W.3d 786, 789 (Mo.App. W.D. 2004) (citation and quotation marks omitted).

2. The dismissal notice also cited issues regarding wound care and the previous demo-

The two appeals were combined, and the PAB conducted a hearing over the course of three days. At the hearing, the Commission, in addition to the causes stated in the dismissal letter, also asserted that Vanderhook should have immediately called an ambulance. Vanderhook argued that her actions were appropriate under the circumstances and that the appointing authority and other nurses were second-guessing her judgment calls in an emergency situation, despite the fact that there were no MVH policies or protocols prohibiting her actions or directing her to do otherwise. The PAB subsequently issued its decision disapproving Vanderhook's demotion and dismissal, finding that the Commission had failed to meet its burden of proving that her demotion and dismissal were for the good of the service. The Commission filed a petition for judicial review in the Circuit Court of Cole County, and the court affirmed both rulings. The Commission now appeals from the disapproval of Vanderhook's dismissal; it does not appeal from the disapproval of her demotion.

 Section 36.380 provides that "[a]n appointing authority may dismiss for cause any employee … when he considers that such action is required in the interests of efficient administration and that the good of the service will be served thereby." Section 36.390.5 permits an employee to appeal to the PAB by setting forth reasons "claiming that the dismissal … was for political, religious, or racial reasons, or not for the good of the service." "Although not defined by the statutes, the standard 'for the good of the service' implies some

personal misconduct or fact that renders the employee's further employment harmful to the public interest." *Lombardi v. Dunlap*, 103 S.W.3d 786, 791 (Mo.App. W.D.2003). "The standard further requires a decision by the appointing authority that the employee's conduct is of such a serious nature that dismissal is required rather than some other form of discipline." *Id.* The burden of proof is on the employing agency to establish grounds for dismissal. *Missouri Veterans Home v. Bohrer*, 849 S.W.2d 77, 78 (Mo.App. W.D.1993). "In approving or disapproving an agency's dismissal, the PAB cannot substitute its judgment for the agency's in deciding what action is for the good of the service." *Lowe v. Lombardi*, 957 S.W.2d 808, 811 (Mo.App. W.D.1997).

 "On appeal, this court reviews the decision of the PAB, not the circuit court's judgment." *Tremain v. Peterson*, 234 S.W.3d 434, 438 (Mo.App. W.D.2007). "This court will affirm the decision of the PAB 'unless it exceeds agency authority; it is not based upon substantial and competent evidence on the record as a whole; it is unreasonable, arbitrary, or capricious; it involves an abuse of discretion; or it is otherwise unlawful.'" *Id.* (quoting *Lombardi*, 103 S.W.3d at 789). "This Court must look to the whole record in reviewing the Board's decision, not merely at that evidence that supports its decision," and we no longer view the evidence in the light most favorable to the agency's decision. *Lagud v. Kansas City Bd. of Police Comm'rs*, 136 S.W.3d 786, 791 (Mo. banc 2004).[3] If the Board's ruling "is supported

---

tion for failure to effectively manage her nursing unit, but Tolbert and Stevenson both testified that Vanderhook's actions concerning K.M.'s fall were the only basis for her dismissal.

**3.** In two cases decided after *Lagud*, this Court continued to apply the "light most favorable" standard to PAB cases rather than the standard prescribed by the Missouri Supreme Court in *Lagud* for review of administrative rulings. *See Dep't of Soc. Servs., Div. of Youth Servs. v. Oliver*, 261 S.W.3d 719, 722 (Mo.App.

by competent and substantial evidence upon the whole record ... the ruling will be affirmed, even though the evidence would also have supported a contrary determination." *Id.* at 791 n. 5. "We may not substitute our judgment on the evidence for that of the agency, and we must defer to the agency's determinations on the weight of the evidence and the credibility of witnesses." *Roorda v. City of Arnold,* 142 S.W.3d 786, 789 (Mo.App. W.D.2004) (citation and quotation marks omitted). We review questions of law *de novo. Lombardi,* 103 S.W.3d at 790.

◼ The Commission asserts in its first point that the PAB exceeded its statutory authority in disapproving Vanderhook's dismissal because it improperly held the Commission to a higher burden of proof. It contends that the PAB required Tolbert, the appointing authority, to prove that her professional judgment as a nurse was superior to that of Vanderhook in order to justify her conclusion that Vanderhook's dismissal was for the good of the service. The Commission further asserts that the PAB improperly substituted its judgment for that of the appointing authority by finding that Vanderhook's dismissal was not for the good of the service. In Point II, the Commission contends that the PAB's disapproval of Vanderhook's dismissal was not supported by substantial evidence upon the whole record, was arbitrary and capricious, and was an abuse of discretion. Its arguments under both points are essentially the same. We will address the two points together.

The Commission essentially argues that the appointing authority's determination that dismissal is for the good of the service is unassailable. This is clearly incorrect

because, otherwise, any appeal of that decision would be futile.

Section 36.390(5) ... states that an employee may file an appeal "setting forth in substance his reasons for claiming that the dismissal, suspension or demotion was *for political, religious, or racial reasons, or not for the good of the service.*" It would be pointless for the statute to provide that the employee may explain why he or she believes dismissal was based on these grounds unless the legislature intended that the reviewing body then determine whether termination was for political, religious, or racial reasons, or not for the good of the service, and, if it finds that this was the basis of termination, to reverse the decision. Otherwise, the right to claim that dismissal was for improper reasons would be a hollow and pointless right indeed.

*Bowen v. Mo. Dep't of Conservation,* 46 S.W.3d 1, 9 (Mo.App. W.D.2001) (internal citation omitted). Here, the PAB did not require the Commission to show that Tolbert's judgment was superior to Vanderhook's. Rather, it simply required the Commission to show that Tolbert's determination that Vanderhook's dismissal was for the good of the service was supported by substantial and competent evidence, which is consistent with the purpose of the appeals process.

◼ It is apparent from the evidence presented at the hearing that the appointing authority did not conduct a thorough investigation before determining that Vanderhook's dismissal was for the good of the service. Tolbert delegated investigation of the fall to Patrick Stevenson. Tolbert reviewed the documents that Stevenson obtained, and spoke with Vanderhook briefly.

W.D.2008); *Seidner v. Webster,* 201 S.W.3d 104, 108 (Mo.App. W.D.2006). To the extent that they applied the improper standard of

review, those cases should no longer be followed.

She relied on several statements made by Carol Shirley that had not been verified and were later shown to be inaccurate.[4] Significantly, neither Tolbert, Stevenson, nor Shirley ever asked Vanderhook why she moved K.M. to the bed or what she did minute-by-minute to care for him, including whether anyone immobilized his neck while he was being moved. Tolbert agreed at the hearing that that would be an important aspect for her to find out before dismissing a nurse.

The undisputed evidence showed that there was no MVH policy prohibiting or cautioning against moving a resident who has sustained a head trauma. Tolbert and Stevenson agreed that treatment in an emergency situation is a judgment call to be made by the nurse on the scene; they simply disagreed with one of Vanderhook's judgment calls in this instance. They did not disagree with her decision to move K.M. the first time to locate and control the bleeding, which the PAB reasonably found was evidence that it was acceptable to move K.M. under certain circumstances. They only disagreed with her decision to move him a second time. Vanderhook testified that she decided to move K.M. to the bed so that she and the staff could more easily attempt to keep him conscious and protect him from further harm if he had another seizure. None of the Commission's witnesses disagreed with these concerns; they just testified that they believed Vanderhook could have addressed them without moving K.M. from the floor. Vanderhook stated that she considered the other available treatment options and determined, after weighing the potential risks of moving versus not moving K.M., that it was best under the circumstances to move him to the bed. It is clear that Tolbert's, Stevenson's, and Shirley's primary complaint about the movement to the bed was that K.M. could have sustained further injury if his neck was injured. However, Vanderhook testified, with no rebuttal, that she was concerned about possible secondary harm due to a neck injury and she immobilized his neck and shoulders by supporting them from the back during both moves to prevent further harm.

There was also no policy regarding whether or when a charge nurse should contact the house supervisor in an emergency situation. Tolbert and Stevenson testified that they thought Vanderhook should have immediately contacted the house supervisor or another licensed nurse to assist and consult during treatment, and Stevenson stated that he, personally, would have gotten a second opinion before moving K.M. However, Shirley held the same license as Vanderhook, and none of the Commission's witnesses could give an example of how K.M. would have benefitted if Vanderhook had contacted her earlier. Indeed, Stevenson agreed that, due to her extensive training and experience as a military support nurse, Vanderhook had as much or more training on how to handle this type of emergency situation as any of the nurses at the MVH. Vanderhook testified, with no rebuttal, that there was no policy requiring her to seek a second nursing opinion before treating a patient and she did not believe that was done unless someone felt that they needed a second

---

4. Tolbert testified that she relied on a note from Carol Shirley stating that Vanderhook's documentation regarding the fall was poor, but she did not question Shirley about the note and she admitted at the hearing nothing had been poorly documented. Tolbert also relied on Shirley's statement that the emergency personnel, or EMTs, had verbally criticized Vanderhook for moving K.M. to the bed. Stevenson did not attempt to verify this comment. Shirley later admitted that she only assumed what the EMTs were thinking based on their "looks," and the EMTs were not called to testify.

opinion. She testified extensively as to the potential risks of moving versus not moving K.M., given that he had potential head and neck injuries and suspected seizure activity, and she stated that she made a judgment call that it was worth the risk of secondary harm to move him.

Tolbert admitted that there was also no policy as to when emergency personnel should be contacted in an emergency situation. Shirley stated that the "true policy" is that an ambulance may be called at any time, with or without physician approval, but she stated that there was nothing in the way K.M. was treated that violated the MVH transfer policy. Nevertheless, they both thought Vanderhook should have immediately contacted emergency personnel. Vanderhook testified that she contacted the attending physician and emergency personnel as soon as she felt that the emergency situation had subsided enough for her to turn over K.M.'s treatment to the staff. She further stated that she did not call 911 immediately because she believed it was an emergency situation she could handle and she usually contacted an attending physician for approval unless the patient was in danger of his heart stopping or bleeding to death, which was not the case with K.M.

The PAB found that "[t]he Appellant's dismissal for KM's fall seems to have come about because relief House Supervisor Carol Shirley, who was an RN like the Appellant but had worked at MVH for a shorter period of time, was offended that the Appellant hadn't called her for a second opinion." It further found that the appointing authority failed to show how Vanderhook's actions denied any appropriate critical care or necessary treatment, as stated in the dismissal letter. It concluded that the appointing authority failed to show that Vanderhook's handling of the situation was good cause for dismissal or

that her dismissal was for the good of the service. The PAB explained that the evidence showed that Vanderhook weighed the risks and made tough decisions in an emergency situation, as she was trained to do, and that her initial assessments proved to be correct and K.M. was treated successfully with no "negative outcomes."

From the foregoing, it is apparent that the PAB's decision was supported by substantial evidence upon the whole record and was not an abuse of discretion. The evidence showed that none of Vanderhook's actions were against MVH policy and that she conducted a thorough and reasoned assessment and made difficult judgment calls in an emergency situation. *Cf. Campbell v. Jeffries,* 753 S.W.2d 93, 95 (Mo.App. E.D.1998) (PAB erred in finding that a nurse's dismissal was not for the good of the service where she did not implement required hospital procedures, resulting in a threat to health, safety, or welfare). The fact that the appointing authority and other nurses, in hindsight, disagreed with her approach does not constitute substantial and competent evidence that her dismissal was for the good of the service. Point denied.

The judgment is affirmed.

All concur.