Marvin J. JOHNSON, Respondent,

v.

Tom CLEMENTS, Director, Division of Adult Institutions, Appellant.

No. ED 95060.

Missouri Court of Appeals,
Eastern District,
Division Two.

May 31, 2011.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 12, 2011.

Application for Transfer
Denied Aug. 30, 2011.

Jeremiah J. Morgan, Jefferson City, MO, for appellant.

Francis X. Duda, St. Louis, MO, for respondent.

GEORGE W. DRAPER III, Judge.

Tom Clement, Director of Adult Institutions, appeals from the circuit court's judgment reversing the Personnel Advisory Board's (hereinafter, "the PAB") decision, affirming the Department of Correction's (hereinafter, "DOC") action dismissing Marvin Johnson (hereinafter, "Johnson") from his employment. Pursuant to Rule 84.05(e)[1], Johnson filed the initial brief and raised two points on appeal, arguing the PAB erred in affirming his dismissal because: (1) it relied on policies and procedures different from those stated in Johnson's discharge letter, which violated his right to notice and substantive due process; and (2) it relied upon erroneously admitted drug test results. The circuit court's decision is reversed and the cause is remanded to reinstate the PAB's decision dismissing Johnson from his employment.

This Court reviews the PAB's decision, not that of the circuit court, to determine whether DOC's action: "(1) is in violation of constitutional provisions; (2) is in excess of the statutory authority or jurisdiction of the agency; (3) is unsupported by competent and substantial evidence upon the whole record; (4) is, for any reason, unauthorized by law; (5) is made upon unlawful procedure or without a fair trial; (6) is arbitrary, capricious or unreasonable; or (7) involves an abuse of

1. Rule 84.05(e) provides: "If the circuit court reverses a decision of an administrative agency and the appellate court reviews the decision of the agency rather than of the circuit court, the party aggrieved by the agency decision shall file the appellant's brief and reply brief, if any, and serve them within the time otherwise required for the appellant to serve briefs. The party aggrieved by the circuit court decision shall prepare the respondent's brief and serve it in a time otherwise required for the respondent to serve briefs."

discretion." *Pogue v. Crawford*, 265 S.W.3d 868, 871 (Mo.App. E.D.2008); Section 536.140.2 RSMo (2000).[2] We must examine the whole record when reviewing the PAB's decision, not only evidence that supports its decision because "we no longer view the evidence in the light most favorable to the agency's decision." *Missouri Veterans' Com'n v. Vanderhook*, 290 S.W.3d 115, 119 (Mo.App. W.D.2009) (*citing Lagud v. Kansas City Bd. of Police Comm'rs*, 136 S.W.3d 786, 791 (Mo. banc 2004)). If we find the PAB's decision is supported by competent and substantial evidence, that decision will be upheld, "even though the evidence would also have supported a contrary determination." *Vanderhook*, 290 S.W.3d at 119–20 (*quoting Lagud*, 136 S.W.3d at 791 n. 5). This Court will, however, defer to the agency's determinations on the weight of the evidence and the credibility of witnesses. *Vanderhook*, 290 S.W.3d at 120.

At the time of his dismissal, Johnson held the position of a Corrections Caseworker I at the Eastern Reception Diagnostic and Correctional Center. Pursuant to DOC policy, Johnson was subject to random drug testing as a condition of his employment wherein a single positive urine test constituted grounds for discipline. On October 2, 2008, Johnson was summoned to report for testing. Albert Henderson (hereinafter, "Henderson"), who serves as the site urinalysis coordinator, and Melissa Blyze (hereinafter, "Blyze"), the collector Henderson was training, worked together to collect Johnson's sample that morning.

After the sample was collected, it was transported in a locked metal box to the Cremer Therapeutic Community Center Toxicology Laboratory (hereinafter, "Cremer Lab") for analysis. Johnson's sample was tested for several classes of drugs. The initial screening test revealed a high level of narcotics. A subsequent confirmation test showed no cocaine in Johnson's urine, but did indicate the presence of Benzoylecgonine, a metabolite of cocaine. Pursuant to Cremer Lab policy, an aliquot of Johnson's sample was sent to National Toxicology Laboratories, Inc. (hereinafter, "the NTL") for independent confirmation of the positive result. After conducting quantitative testing, the NTL report confirmed the Cremer Lab results.

Johnson was placed on paid administrative leave effective immediately because of the positive drug test result. Johnson spoke to several officials at DOC and notified them the protocol for collecting his sample had not been followed and provided documentation of the prescription medications he was taking. Johnson also prepared several interoffice communication memoranda responding to the positive test results. On November 10, 2008, Johnson was notified of his dismissal via letter after a predisciplinary hearing.

Johnson filed an application for appeal wherein the PAB approved his dismissal after a contested hearing "for the good of the service." Johnson filed for a petition for judicial review of the PAB's decision in the circuit court which held his dismissal was not supported by the competent and substantial weight of the evidence presented, and was arbitrary, capricious, unreasonable, and denied him due process. The circuit court ordered Johnson be reinstated and remanded the case to the PAB to determine the proper amount of back pay and benefits. This appeal follows.

In his first point, Johnson argues the PAB erred in affirming his dismissal because it relied on policies and procedures different from those stated in Johnson's

---

**2.** All statutory references are to RSMo (2000) unless otherwise indicated.

discharge letter. As a result, Johnson claims the PAB violated his right to notice and substantive due process.

■ Missouri state employees possess a property interest in their jobs. *Tremain v. Peterson*, 234 S.W.3d 434, 438 (Mo.App. W.D.2007). "Thus, due process requires that, before the employee can be deprived of this property interest, the employee must receive adequate notice and an opportunity for a hearing." *Lombardi v. Dunlap*, 103 S.W.3d 786, 790 (Mo.App. W.D.2003). To that end, Section 36.380 provides in pertinent part, "No dismissal of a regular employee shall take effect unless, prior to the effective date thereof, the appointing authority gives to such employee a written statement setting forth in substance the reason therefor and files a copy of such statement with the director." This notice is required so that the employee is apprised with "adequate information about the reasons for the dismissal to enable the employee to prepare a defense." *Lombardi*, 103 S.W.3d at 790. Whether an employee received sufficient notice under the statute is a question of law we review *de novo*, providing no deference to the circuit court or the PAB's decision. *Tremain*, 234 S.W.3d at 439.

■ "While a suspension or dismissal letter need not cite the specific policy or rule the employee violated, if the specific policy or rule is not cited, the letter must explain the policy or rule and indicate how the employee's conduct was in violation thereof." *Lombardi*, 103 S.W.3d at 790; *see also*, *Tremain*, 234 S.W.3d at 439. The notice provided in the dismissal letter "must be sufficiently specific as to the time and nature of the incident at issue so that the employee has no uncertainty as to the acts related to [his or] her discharge." *Id.* We must read the dismissal letter as a whole, taking care to not consider specific parts in isolation. *Lombardi*, 103 S.W.3d at 790.

■ When reading the document as a whole, we find Johnson's dismissal letter provided adequate notice of the reasons for his dismissal so that he was capable of preparing a defense. Johnson received his dismissal letter from DOC on November 10, 2008, after a predisciplinary meeting. The letter stated Johnson was subject to random drug testing pursuant to DOC Policy D2–11.11. After explaining when and where Johnson's sample was collected and tested, the letter informed him he tested positive for Benzoylecgonine, a metabolite of cocaine, which was indicative of illicit drug use. The letter stated it was DOC's policy to provide a drug-free workplace and all employees were expected to abide by this policy. The letter then listed four specific DOC policies and procedures which Johnson's actions violated:

D2–11.10 Staff Conduct, Section III.A.12 which states staff are expected to represent to the public the highest moral, ethical and professional standards and must accept as a condition of employment a code of personal conduct beyond that of a staff member in the private sector or some other public sector positions.

D2–11 Employee Standards, Section I, which states, "All employees of the [DOC] are expected to maintain professionalism during the performance of their duties and in their relationships with the public, fellow employees, and offenders."

D2–11 Employee Standards, Section I.A.6, which states, "Employees of the State are expected to comply with the statutes of Missouri at all times."

D2–11 Employee Standards, Section I.B, which states, "Executive Branch employees shall conduct themselves in

scrupulous compliance with applicable federal, state, and local law."

The letter concluded by stating, "Your actions are unlawful, unprofessional and compromise safety and security. Your dismissal is necessary for the good of the service and is required in the interests of the efficient administration of the Division of Adult Institutions."

It is clear Johnson's dismissal letter cited specific DOC policies he violated and was sufficiently specific as to the time and nature of the incident at issue so that Johnson could prepare a defense. Johnson was not deprived of adequate notice or substantive due process. Point one is denied.

In his second point, Johnson argues the PAB erred in affirming his dismissal because it relied on an erroneously admitted drug test containing faulty results. Specifically, Johnson argues the test results were unreliable and inadmissible because: (1) the collection procedures were not followed; (2) the results were irregular; (3) the chain of custody was not maintained; and (4) the testimony accompanying the admission of the results constituted inadmissible hearsay.

First, Johnson argues the urine collection procedures were violated in several respects. Johnson, Henderson, and Blyze gave divergent accounts of how Johnson's sample was collected. There were also interoffice communication memoranda submitted for the PAB's review from Johnson, which outlined several deviations in the collection process, and from Henderson, who gave two seemingly contradictory explanations. Despite this conflict, the PAB determined the Appointing Authority presented credible evidence that Johnson's urine sample was collected and screened properly. The PAB specifically found Henderson and Blyze were "simply more credible", especially in light of Henderson's past experience and accuracy in collecting samples for testing. The PAB also examined Dr. Christopher Long's (hereinafter, "Dr. Long") testimony offered on Johnson's behalf, which criticized the collection process. The PAB determined Dr. Long had not talked to Henderson or Blyze independently, nor was he familiar with their full testimony on the issue before rendering his opinion. "We may not substitute our judgment on the evidence for that of the agency, and we must defer to the agency's determinations on the weight of the evidence and the credibility of witnesses." *Vanderhook*, 290 S.W.3d at 120 (*quoting Roorda v. City of Arnold*, 142 S.W.3d 786, 789 (Mo.App. W.D.2004)).

Second, Johnson heavily relies on Dr. Long's testimony to support his assertion that the Cremer Lab test results were irregular. Dr. Long opined it was suspicious that Johnson's sample would screen at the exact same cut-off number Cremer Lab used. However, the PAB determined Dr. Long rendered his opinion "without having reviewed all of the pertinent information" wherein he admitted he read only two pages of the seventeen-page report issued by Cremer Lab. Moreover, the PAB found Dr. Long misread some of the information he was provided, which he admitted at the hearing, thereby further undermining his credibility. Again, we must defer to the PAB's judgment on the weight of the evidence and the credibility of the witnesses. *Vanderhook, supra*.

Third, Johnson argues the chain of custody was not maintained throughout the handling and testing of his urine sample, again relying on Dr. Long's expert testimony. Dr. Long criticized the gap on the chain of evidence form showing Henderson collected the sample at 11:05 a.m. and Blyze then took custody of the sample at 1:20 p.m. Dr. Long speculated Henderson

must have been walking around with the sample during that gap, which could have contaminated the sample. The PAB found Blyze and Henderson gave credible testimony that the sample was in Henderson's possession in the collection room during the gap and was in a locked box, which was secured in his office, until Blyze picked up all of the samples Henderson collected at 1:20 p.m. The PAB also discredited Dr. Long's opinion because he failed to discuss the issue with Henderson or Blyze, and he was unfamiliar with their full testimony on the issue before rendering his opinion. Moreover, even if we were to put aside these binding credibility determinations, the PAB also found the chain of custody was easily followed by examining the Cremer Lab report and the NTL report. Dr. Long conceded the NTL chain of custody document was proper. The PAB determined if the NTL documentation was proper in Dr. Long's opinion, then Cremer Lab's documents, which contained significantly more detail, was likewise sufficient.

Fourth, Johnson argues the testimony of Carol Bates (hereinafter, "Bates"), which accompanied the report from Cremer Lab, constituted inadmissible hearsay because the witnesses who performed the actual testing of Johnson's urine sample did not testify. Johnson relies upon *Melendez–Diaz v. Massachusetts*, —— U.S. ——, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009) to support the argument his right to confrontation was violated. In *Melendez–Diaz*, a criminal defendant argued his right to confrontation was violated when a sworn affidavit reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine was admitted without accompanying testimony by any laboratory personnel to that effect. *Id.* at 2530. The Supreme Court determined this violated the defendant's right to confrontation because the document and the results therein were testimonial in nature and required the preparer or analyst to be subject to cross-examination. *Id.* at 2532. The Supreme Court clarified its holding, however, stating:

> [W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case.... [T]his does not mean that everyone who laid hands on the evidence must be called.

*Id.*, n. 1 (citations omitted). Further, we note Missouri law "does not require proof of hand-to-hand custody, a showing that the exhibit was continually watched, or proof of the exclusion of every possibility that the evidence has been disturbed." *State v. Jones*, 204 S.W.3d 287, 296 (Mo. App. S.D.2006)(*quoting State v. Sammons*, 93 S.W.3d 808, 810 (Mo.App. E.D.2002)).

We find Johnson was not denied his right to confrontation in this case. Bates testified she was the manager of Cremer Lab, and her job duties included monitoring all phases of testing and the employees performing the testing. Bates offered detailed testimony regarding the chain of custody of Johnson's urine sample. Typically, any errors laboratory employees notice with respect to the chain of custody documentation or the condition of the sample when it arrives at the laboratory are noted in the comments section of the chain of evidence form. Here, no errors were noted. When testifying with respect to Johnson's chain of custody form from the laboratory, Bates named each employee who conducted each phase of testing, the date, and the time of the testing. After all screening and confirmation tests were

completed, the results and paperwork were forwarded to Bates for her review and approval. Bates indicated she was the "final reviewer" of the results and put her initials on the chain of evidence form. Bates then completed a worksheet with the official results and submitted those results to the employer and personally sent out Johnson's samples to the NTL for verification testing. Bates was subject to rigorous cross-examination regarding the chain of custody, the testing processes, the subsequent results, and the procedure to obtain verification testing. Finally, we note the Appointing Authority argued, and the PAB agreed, that Johnson's arguments went more to the weight of the evidence as opposed to its admissibility, and that the ultimate question the PAB would have to determine is who it is going to believe. As stated previously, this Court cannot re-weigh the evidence or the PAB's credibility determinations. *Vanderhook, supra.*

Thus, after considering all of Johnson's arguments with respect to the admission of the drug test results, we find the PAB did not err in admitting this evidence or relying upon it when making its decision. Point two is denied.

The circuit court's decision is reversed and the cause is remanded to reinstate the PAB's decision dismissing Johnson from his employment.

GLENN A. NORTON, P.J., and KATHIANNE KNAUP CRANE, J., concur.