

# Missouri Court of Appeals

### Southern District

### Division Two

| | | |
|---|---|---|
| JUSTIN WAYNE DALE, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | No. SD32793 |
| | ) | |
| MISSOURI HIGHWAYS and | ) | **Filed: July 17, 2014** |
| TRANSPORTATION COMMISSION, | ) | |
| | ) | |
| Respondent-Respondent. | ) | |

APPEAL FROM THE CIRCUIT COURT OF HOWELL COUNTY

Honorable Truman L. Wiles, Judge

## AFFIRMED

Justin Wayne Dale ("Appellant") contests the circuit court's judgment upholding a final decision of the Missouri Highways and Transportation Commission ("the Commission") affirming the Missouri Department of Transportation's ("MoDOT") decision to deny Appellant relocation assistance as a "displaced person" regarding a saw mill business he claims was displaced by the partial condemnation of a tract of land on which his business was located.

This appeal follows two other related appeals. In *State ex rel. Mo. Hwy & Transp. Comm'n v. Dale*, 309 S.W.3d 380, 382 (Mo. App. S.D. 2010) ("*Dale I*"), we affirmed the judgment following a jury trial that awarded John and Marsha Dale, Appellant's parents,

1

condemnation damages in the amount of $445,643.20 for 3.44 acres ("the taken land") of a 10.8 acre tract ("the property") owned by the Dales after the taken land was condemned "to facilitate highway improvements to U.S. Route 60[.]"[1]  In ***Dale v. Rahn***, 330 S.W.3d 107, 109 (Mo. App. S.D. 2010) (***Dale II***), we affirmed the Commission's denial of relocation assistance to John Dale ("Father") "because he did not meet Missouri's statutory definition of a 'displaced person[.]'"[2]

In the instant appeal, Appellant contends in three points that the Commission erred in denying his "claim for relocation assistance benefits on the ground that he was not a displaced person[.]"  Point I asserts that no substantial evidence supported the finding that there had been a payment for the cost to cure the remainder.  Point II contends the Commission erred in applying a cost to cure as an exception to relocation assistance eligibility given the property's status as commercial property, instead of residential property, in that a cost to cure was not a part of the right-of-way offer, and the remainder was landlocked.  Point III claims the Commission erred in concluding that he was not a displaced person because a business must "remove its personal property from the remainder in order to

---

[1] We will refer to the remaining acreage as "the remainder."

[2] As we noted in ***Dale II***:

> Relocation assistance for eligible persons in Missouri is required by federal provisions when federal money is involved in the public project.  *See* 42 U.S.C. Section 4601, et. seq; Section 523.200(1)–(2); 7 C.S.R. 10–4.020.  Missouri also "give[s] similar relocation assistance to displaced persons when the property involved is being acquired for the same public purpose through the same procedures, and is being purchased solely through expenditure of state or local funds."  Section 523.205.1 RSMo 2000.  Whether the project here involved federal funds is not apparent from the record.

*Id.* at 111 n.8.  In the instant appeal, Appellant assumes, without citation to the record, that the project was one requiring application of 42 U.S.C. 4601 et seq. ("the Act").  The Commission stated that the instant case was an appeal under the Act "and under 7 C.S.R. 10-4.010[.]"  The Commission concluded that it had "jurisdiction of this cause under 42 U.S.C. §§ 4628, 4630, 4633 and §226.150 RSMo (2000)."  Appellant cites 49 C.F.R. 24.1, *et seq.*, as the source for "implementing federal regulations[,]" but he does not rely on any of the federal regulations in his points or arguments, and he does not claim that the provisions of the Relocation Assistance Manual ('Manual'), as incorporated by 7 C.S.R. 10-4.020 (2007), are inconsistent or incompatible with any of the federal regulations related to the Act.  We therefore limit our analysis to the sections of the Manual offered into evidence by Appellant and admitted by the Commission.

be displaced" as Appellant's business "was discontinued as a result of the taking, and a discontinued business is not required to remove its personal property from the remainder in order to be eligible for relocation assistance benefits."

Because the Commission reached the correct result, we affirm.

## Applicable Principles of Review

We borrow our statement of the applicable standard of review from ***Dale II***:

> Although the appeal is from the judgment of the circuit court, we review the action of the administrative agency. *Albanna v. State Bd. of Registration for Healing Arts*, 293 S.W.3d 423, 428 (Mo. banc 2009). "Article V, Section 18 of the Missouri Constitution articulates the standard of judicial review of administrative actions. On appeal, this Court is charged with determining whether the agency actions 'are authorized by law, and in cases in which a hearing is required by law, whether the same are supported by competent and substantial evidence upon the whole record.'" *Id.* (quoting Mo. Const. art. V, section 18).

> > If the [Commission]'s ruling "is supported by competent and substantial evidence upon the whole record ... the ruling will be affirmed, even though the evidence would also have supported a contrary determination." [*Lagud v. Kansas City Bd. of Police Comm'rs*, 136 S.W.3d 786,] 791 n. 5. [ (Mo. banc 2004) ]. "We may not substitute our judgment on the evidence for that of the agency, and we must defer to the agency's determinations on the weight of the evidence and the credibility of witnesses." *Roorda v. City of Arnold*, 142 S.W.3d 786, 789 (Mo.App. W.D.2004) (citation and quotation marks omitted). We review questions of law *de novo*. *Lombardi*[ *v. Dunlap*], 103 S.W.3d [786,] 790[ (Mo. App. W.D. 2003)].

> *Missouri Veterans' Comm'n v. Vanderhook*, 290 S.W.3d 115, 119–20 (Mo.App. W.D.2009).

> "We will not reverse the decision of an administrative agency that reaches the right result even if it gave a wrong or insufficient reason for its ruling." *Ellis v. Missouri State Treasurer*, 302 S.W.3d 217, 220 (Mo.App. S.D.2010). We should affirm if we could reach the same result based on the same evidence and without weighing evidence or assessing witness credibility.

330 S.W.3d at 110.

## Facts and Procedural Background

Up until 2003, Father had operated a scrag mill on the property to produce sawdust for charcoal makers. *Dale II*, 330 S.W.3d at 109. Appellant did not have a written lease with Father, but Appellant began operating his own saw mill on the property in 2000. In May 2006, negotiations for the purchase by MoDOT of the taken land failed, *id.*, and the condemnation petition was filed on May 11, 2006. "[A] day or two" later, Father deeded the property to Appellant without requiring the payment of any money.[3] Appellant testified at the appeal hearing that the remainder was landlocked as a result of the taking.[4] He testified that he "sawed [his] last log in October of 2006 and continued to sell [his] existing lumber inventory until late December of 2006." Appellant testified that he "could not operate [his] business on [the remainder] after the acquisition."

Appellant's only personal property on the taken land at the time of the condemnation was "a Knuckleboom loader[,]" which was equipped with wheels, and Appellant moved it to the remainder using "a semi tractor." At the time of the hearing, Appellant did not recall what it cost him to move the Knuckleboom loader. Appellant testified that he had not relocated anything from the remainder and he had done nothing with the remainder.

Steve Shelton testified that he was the "right of way manager" on this matter, and he met with Appellant in September 2010 about his request for relocation assistance. MoDOT sought additional information from Appellant after that meeting, Appellant provided additional information in an October 2010 letter, and MoDOT informed Appellant in a

---

[3] Nonetheless, "ownership of property for purposes of a condemnation action is determined at the time the petition in condemnation is filed." *State ex rel. Mo. Hwy & Trans. Comm'n v. Starling Plaza P'ship*, 832 S.W.2d 518, 521 (Mo. banc 1992).
[4] Appellant represented himself at the hearing.

4

December 2010 letter that he was "not eligible for relocation benefits[.]  The letter also advised Appellant that if he disagreed with MoDOT's determination, Appellant had "the right to file a claim for . . . the type of payment being claimed."

Appellant wrote a letter to MoDOT, dated February 9, 2011, in which he asked that the letter be accepted as his claim ("the Claim").  Appellant attached an inventory of 26 items (including the Knuckleboom loader) that he intended to relocate "in order to continue [his] business" using "a self-move" instead of "a commercial move[.]"  The Claim requested that "the district obtain the necessary moving cost estimates or make an official determination that it is not practical to obtain moving cost bids due to the complexity of the move and follow the procedures set forth in the [M]anual when moving cost bids are not available."  The Claim went on to state:

> The purchase of a suitable replacement site and construction of a building to conduct the business in, coupled with the expense of disconnecting, moving, and reconnecting the machinery produces a financial hardship that exceeds my financial capabilities.  While a replacement site and building is not compensable[,] I cannot in good faith purchase them at my expense without a moving cost agreement from MoDOT to pay for the expenses incurred in moving the personal property and reestablishing the business.

The Claim made no demand for any monetary payment in lieu of actual costs.

MoDOT denied the Claim in a February 22, 2011 letter, and Appellant requested an appeal hearing.

At the appeal hearing, Appellant testified that it was his "desire to relocate and reestablish the business, and [he] fully underst[oo]d that until the business is relocated and reestablished, that [he is] not eligible to receive a payment for reimbursement of expenses incurred in relocating and reestablishing the business."  He further testified:

> I fully understand that today at this moment I am not eligible for a moving cost payment or reestablishment expense payment, and I'm not here

5

today to appeal the rejection of the claim for payment because I have not filed a claim for payment. I'm appealing the district determination that my business is not totally displaced and, therefore, I'm not eligible for reimbursement of the expenses incurred in relocating and reestablishing the business.

A forester, Shelby Jones, testified on behalf of Appellant that two mills -- the scrag mill and the saw mill -- could not both operate on the remainder after the taken land was condemned. He opined, however, that the remainder was sufficient for one mill to operate. In his letter report, admitted at the hearing as Exhibit G, Mr. Jones specified that the scrag mill could continue to operate on the remainder. He gave no estimate as to the cost of modifying the operation to permit the continuation of a mill.

Father also testified on behalf of Appellant that neither the scrag mill nor the saw mill could operate after the taken land was removed. Father admitted that he had closed his scrag mill in 2003.

Another forester, Ralph Allison, testified on behalf of MoDOT that Appellant's saw mill could operate on the remainder with some modifications "to make better use of this area[.]" He did not calculate a cost for the necessary modifications.

MoDOT moved for admission of the trial transcript from the condemnation trial, Appellant objected on the grounds of relevancy, and the transcript was admitted as Exhibit 1. The trial transcript included the testimony of an appraiser, Bill Craig, who considered the "cost to get an access by necessity to the subject property" given that the condemnation would leave the remaining property landlocked. Based upon his conversation with an attorney, Craig estimated that access could be obtained for approximately $20,000 in legal fees and the cost of the land. He also opined that the remainder could be used as a saw mill after the condemnation of the taken land.

6

The transcript also included the testimony of another appraiser, Jack Blaylock, who opined that "a sawmill operation with a two stage operation" could not be used on the remainder. He agreed, however, that an owner of a landlocked piece of property would be "entitled to a way of private necessity" "[i]f you can prove that to the court[.]"[5]

After hearing the evidence, the Commission concluded that "[t]he only dispute in this hearing is [Appellant's] eligibility for payment." The Commission's factual findings included that "[Appellant] has not operated the sawmill business since 2006 . . . . [and Appellant] had no non-mobile personal property within the [taken land.]" The Commission further found that "[Appellant] has made no attempts to relocate his sawmill business nor moved any personal property other than the [Knuckleboom loader]" and that "[Appellant] has done nothing with his property[.]" The Commission noted that there was "no dispute regarding the fact that [Appellant] is not currently eligible for moving cost payment or reestablishment expenses to relocate his sawmill business[.]"

The Commission also found that "[t]he property damage to the remainder caused by the condemnation was paid in the condemnation action as the cost to cure which included the cost to legally obtain a way of necessity to access the property[,]" and the remainder was "not prevent[ed] . . . from being used exactly as it had been before the condemnation action" in that "[t]he property can be used as a sawmill in the after taking condition[.]" As a result, the Commission found that "[Appellant's] business [was] not totally displaced."

---

[5] The jury instruction required the jury to "award . . . such sum as you believe was the difference between the fair market value of the entire property immediately before the taking . . . and the fair market value of the remaining property immediately after the taking." *Dale I*, 309 S.W.3d at 383. The instruction referred to different types of evidence regarding values, but it did not refer expressly to damages for the cost of curing the remainder. *Id.* "[T]here was evidence of damages presented ranging from $138,000.00 to $556,150.00 such that the jury's award of $450,000.00 was within that range of values." *Id.* at 386. Mr. Craig's testimony included the damage figure of $138,000 and he "included a cost to cure approach in his determination to take into account the cost for Respondents to legally obtain a way of necessity to access their property." *Id.* at 382-83. Mr. Blaylock testified that the damages were $556,150 but "he did not employ the cost to cure method because it was not applicable." *Id.* at 382.

The Commission concluded that "[Appellant] fails to meet the definition of a Displaced Person.  [Appellant] was not totally nor partially displaced."  It found that regardless of whether Appellant could operate a saw mill on the remainder, "[Appellant] has not operated his saw mill business since 2006[,]" and "[Appellant] by his own admission did not move from his property nor did he possess moveable person[al] property[.]  If the business is not moved it does not satisfy the basic purpose of the relocation program to help those who move as a result of a condemnation."  Further, "[a] cost to cure was already paid as part of the condemnation action on the subject property and as such will not be further considered by this tribunal."  The Commission found that "[Appellant] himself was not operating a business at the location at the time of his request for relocation assistance benefits and has not for a number of years."  The Commission concluded that "[Appellant] failed to meet his burden of proof.  [Appellant] is not eligible for relocation assistance benefits."

This appeal timely followed the circuit court's affirmation of that decision.

### Relevant Manual Provisions

Various portions of the Manual were admitted into evidence as exhibits on behalf of Appellant without objection by MoDOT.[6]  Appellant further contends that because the Manual has been published in the Code of State Regulations, it is subject to judicial notice, and the provisions of the Manual "have the force and effect of law."  MoDOT also relies upon the Manual and describes it as having been codified.  Based on this apparent agreement of the parties, we assume, without deciding, that the Manual provisions

---

[6] The 2006 edition of the Manual was incorporated into 7 CSR 10-4.020 by reference; it was not set out verbatim in the regulation and the reader of the regulation is directed to the Commission in order to obtain the Manual.  7 CSR 10-4.020(1).  The regulation, as amended in 2007, did not "incorporate any subsequent amendments or additions of this manual."  *Id.*

8

introduced at the appeal hearing are the rules that govern their dispute.  We will now set forth those provisions that guide our analysis.

Section 236.8.1.2(b) addresses "**General Eligibility Requirements**" and provides that "[t]o be eligible for relocation payments (except moving payments) relocatees must legally occupy property that is scheduled for acquisition by [MoDOT] at the time negotiations are initiated for the subject parcel[.]"  Section 236.8.1.3(c) defines a "**Displaced Person**[,]" *inter alia*, as "any person who moves from legally occupied real property, or moves personal property from legally occupied real property, as a direct result of the acquisition of such real property in whole or in part by [MoDOT.]"[7]

Section 236.8.1.3(c)(4), entitled "**Displaced Tenants and Owners--Not Located Within Right of Way Taking**[,]" includes sections on "**Tenants**" and "**Owners**" and provides, *inter alia*, in the subparagraph regarding "**Owners**" that

> [a]n owner who occupies a remainder . . . will not be eligible for relocation payments if (1) his right of way payment includes damages, in addition to the payment for property and rights acquired from him, which were specifically computed as being adequate to pay for a cure of the deficiencies which makes the remainder uninhabitable, and (2) he has the legal right and physical space to accomplish the cure.

However, the paragraph that follows states:

> Occupants of remainders which become legally and/or physically landlocked due to a right of way taking are eligible for the same relocation assistance and payments as occupants of properties which are actually acquired by the department; therefore, routine policies and procedures provided throughout the manual are applicable under this circumstance rather than the special policies and procedures provided in this subparagraph.

Section 236.8.7.6 addresses "**Reestablishment Expense**" and provides that

---

[7] A displaced person is defined under 42 U.S.C. section 4601(6)(A)(i)(I), insofar as relevant here, as "any person who moves from real property, or moves his personal property from real property . . . as a direct result of a written notice of intent to acquire or the acquisition of such real property in whole or in part for a program or project undertaken by a Federal agency or with Federal financial assistance[.]"

a small business, as defined in [section] 236.8.1.3(1) . . . may be eligible to receive a reestablishment payment not to exceed $10,000. This payment is for *expenses actually incurred in relocation and reestablishment at a replacement site* and does not apply to part-time businesses in the home . . . . Utilize RAForm 236.8.7.6 (Relocation Business Reestablishment Cost Agreement) when advance payments are a necessity.

(Emphasis added.)

Section 236.8.7.9(c)(1) addresses situations involving "**Self-Moves**" by "[t]he qualified owners of any displaced businesses" so that the move is accomplished by the relocatee and not a commercial moving company, and "**Moving Cost Estimates are Available**[.]"[8] The regulation sets forth separate steps to be accomplished for a self-move, including:

**Step One:**     The relocatee must prepare an inventory of the items of personal property that must be moved . . . .

            . . . .

**Step Two:**     The relocatee must advise the district, in writing, of his/her intent to conduct a self-move and request that the district obtain the necessary moving cost estimates. The inventory must be provided to the district by the relocatee at the time the estimate request is made.

**Step Three:**     Upon receipt of the relocatee's request, a district representative must make an on-site inspection of the items that will be involved in the move and assure that the inventory is reasonably accurate. . . .

**Step Four:**     The district must obtain at least two moving cost estimates from commercial movers who are qualified to conduct the move if the moving cost is expected to exceed $2,500. . . .

    *Estimates should not normally be obtained before the relocatee has selected a replacement site so that the actual mileage can be used. . . .*

            . . . .

---

[8] Section 236.8.7.9(c)(2) addresses self-moves where "**Moving Cost Bids or Estimates Are Not Available**[,]" but as discussed *infra*, this subsection involves "prior approval from the Right of Way Division office[.]"

**Step Six:** After the approved "Moving Cost Agreement" is returned to the relocatee, he/she should provide the 5-day written moving date notice (unless waived by the district) and complete the move.

. . . .

**Step Nine:** The relocatees must file their claim for reimbursement, within the 18-month period discussed in [section] 236.8.7.8(b).

(Emphasis added.)

## Analysis

We first consider Point III. In it, Appellant contends the Commission erred as a matter of law in finding "that he was not a displaced person due to his failure to remove the personal property of the business from the remainder" because "a discontinued business is not required to remove its personal property from the remainder in order to be eligible for relocation assistance benefits." Appellant argues that the Commission's construction of "displaced person" so as "to require that the personal property of a business be physically removed from the remainder" misses that "even though the personal property of a discontinued business stays on the remainder, the business is nevertheless displaced because it is no longer operating as a business." Whether assistance to discontinue a business may be paid in a given case is not relevant here because Appellant sought assistance to move his business, not to discontinue it.

Several of the cases Appellant cites in his brief are not binding precedent as they involve decisions rendered by federal district courts. *See **State v. Mack**,* 66 S.W.3d 706, 710 (Mo. banc 2002). Further, we find the cases he relies on unpersuasive. Appellant relies upon ***Tenn. Gas Pipeline Co. v. New England Power, C.T.L., Inc.***, 6 F.Supp.2d 102, 103-

05 (D. Mass. 1998), where the possibility of an advance payment of relocation benefits was recognized in dicta discussing a gas pipeline company's efforts to condemn property under the federal Natural Gas Act.[9] The question of whether an advance payment of relocation payments was available was not reached as the record was "insufficient to determine whether [the business] qualifies under the [federal] regulations" for an advance payment as there was no evidence of the cost to move the property or the business' ability to pay the costs. *Id.* at 105. Here, Appellant stated in the Claim in a conclusory fashion that it "would create a severe financial hardship" for him to "relocate [his] business without any correspondence from MoDOT[.]" The Claim did not include any asserted facts or attach any documents that might demonstrate the existence of any such hardship, and he does not assert on appeal that he presented any evidence of financial hardship at the appeal hearing.

Appellant also cites ***Beaird-Poulan Div. of Emerson Elec. Co. v. Dep't of Hwys***, 441 F.Supp. 866 (W.D.La. 1977); ***Smith v Mo. State Hwy Comm'n***, 488 S.W.2d 230 (Mo. App. K.C.D. 1972); and ***Steppelman v. State Hwy Comm'n***, 650 S.W.2d 343 (Mo. App. W.D. 1983). These cases are distinguishable from the instant case.

Appellant cites ***Beaird-Poulan***, 441 F.Supp. at 869, for the proposition "that the business was 'displaced' by the owner's decision not to continue the business operation on the remain[ing property,]" thereby suggesting that it was sufficient for Appellant to decide to discontinue his business and thereby become displaced. The court in ***Beaird-Poulan*** stated that "[t]he Act does not require that assistance be given to every person who loses a portion of his land to a federally assisted project. Reimbursement of expenses is due only when it can be shown that the owner moved as a result of the partial acquisition." *Id.* at 872. But as

---

[9] The business in that case was actually arguing that the condemnation could not proceed until moving expenses had been paid. *Id.* at 105.

Appellant acknowledges, the business in ***Beaird-Poulan*** *did* relocate, and it subsequently brought an action under 42 U.S.C. section 4601, *et seq.*, "to recover moving and relocation expenses from the Department of Transportation and Development of the State of Louisiana[.]" 441 F.Supp. at 867. That an actual move took place and relocation expenses were incurred in that case distinguishes it from the case at bar.

In ***Smith***, 488 S.W.2d at 232, the court addressed a denial of benefits under an earlier act, "the Federal Highway Relocation Assistance Act of 1968," then set out at 23 U.S.C., section 501 et seq.[10] The court found "that the plaintiff could relocate his business without a substantial loss of existing patronage [was] not supported by substantial or competent evidence" where the plaintiff's testimony that he was "required to discontinue his business . . . . was not effectively disputed." ***Id.*** at 239. The question in ***Smith*** was the availability of "a fixed relocation payment" to a plaintiff who simply moved his business to his home and then discontinued it. ***Id.*** at 237-38.

Appellant also cites ***Steppelman*** for the proposition that it was up to the business to decide whether to continue operating on the remaining property, 650 S.W.2d at 344, and the business was entitled to relocation assistance benefits whether the business was discontinued or relocated. ***Id.*** at 345. The relocation payment identified in ***Steppelman*** was also "a fixed relocation payment" under 42 U.S.C. section 4622(c), ***id.***, which is in lieu of the actual costs of moving and relocating the business as described under section 42 U.S.C. section 4622(a).

Here, Appellant stated that it was his "intention to relocate these items of personal property [presumably the items shown in the inventory list attached to the Claim] in order to continue [his] business." The Claim made no demand for a fixed relocation payment in lieu

---

[10] This federal act was repealed by the Act. ***Whitman v. State Hwy Comm'n***, 400 F. Supp. 1050, 1064 n.18. (W.D. Mo. 1975).

of actual costs, and the Claim referred to "a moving cost agreement from MoDOT to pay for the expenses incurred in moving the personal property and reestablishing the business." Again, even if we assume as true the proposition that Appellant could not have operated his business on the remainder, he still had the burden to prove that he was eligible for the relocation assistance he claims he was entitled to receive.

The Claim expressed the "intent to conduct a self-move[,]" it included an inventory of personal property to be moved, and it requested that "the district obtain the necessary moving cost estimates or make an official determination that it is not practical to obtain moving cost bids due to the complexity of the move and follow the procedures set forth in the [M]anual when moving cost bids are not available." Appellant does not claim in his point that this was a situation where moving cost estimates were not available such that section 236.8.7.9(c)(2) -- addressing situations where "the relocatee can be authorized by the district (with prior approval from the Right of Way Division office) to conduct the move without" "moving cost bids or estimates" -- should be applied. On the contrary, in his testimony before the Commission, Appellant referred to the steps required by section 236.8.7.9(c)(1) that apply when a moving cost bid is available. We therefore focus our attention on the requirements for a self-move with moving cost estimates as described in section 236.8.7.9(c)(1).

It appears that the Claim satisfied **Steps One** and **Two** of section 236.8.7.9(c)(1) by providing an inventory to MoDOT, advising MoDOT of the intent to conduct a self-move, and requesting that MoDOT obtain moving-cost estimates. Assuming that MoDOT should have complied with "**Step Three**" -- inspecting the items on the inventory to make sure that it was "reasonably accurate" -- such action by MoDOT at that point could not have

14

culminated in a "moving cost agreement."  The next step -- "**Step Four**" -- requires MoDOT to "obtain at least two moving cost estimates[,]" but it also provides that such "[e]stimates should not normally be obtained before the relocatee has selected a replacement site so that that actual mileage can be used."  The Claim did not identify such a replacement site. Without that information, MoDOT could not have prepared a "moving cost agreement" because the distance between the remainder and the business's new location could not be determined.

Thus, assuming, *arguendo*, that Appellant was at least partially displaced and could no longer operate a saw mill on the remainder, he nonetheless failed to provide MoDOT with the information it needed to prepare a "moving cost agreement."  Therefore, the Commission's finding that Appellant failed to meet his burden of proof is supported by substantial evidence, and Point III fails.

Because Appellant was ineligible for relocation assistance based on his failure to move or even identify the new location for his business, his first two points, which challenge the Commission's reliance on a cost-to-cure rationale in denying the Claim, are moot, and the order of the Commission is affirmed.

DON E. BURRELL, J. - OPINION AUTHOR

JEFFREY W. BATES, P.J. - CONCURS

MARY W. SHEFFIELD, J. - CONCURS